81 F.3d 858
 151 L.R.R.M. (BNA) 3001, 64 USLW 2667,
131 Lab.Cas. P 11,561,
1996-1 Trade Cases P 71,363,
96 Cal. Daily Op. Serv. 2631,
96 Daily Journal D.A.R. 4342
 PHOENIX ELECTRIC COMPANY, an Oregon corporation; New Tech
Electric, an Oregon corporation; Associated
Builders and Contractors, Inc., a
Maryland corporation,
Plaintiffs-Appellants,
v.
NATIONAL ELECTRICAL CONTRACTORS ASSOCIATION, a foreign
corporation; National Electrical Contractors Association,
Oregon-Columbia Chapter, an Oregon corporation; Atlas
Electrical Contractors, Inc., an Oregon corporation; Oregon
Electric Construction, Inc., an Oregon corporation;
International Brotherhood Of Electrical Workers, Local 48,
Defendants-Appellees.
 No. 94-35522.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Sept. 12, 1995.
Decided April 15, 1996.
 
 Maurice Baskin, Venable, Baetjer, Howard & Civiletti, Washington, DC, for plaintiffs-appellants.
 Thomas W. Sondag, Portland, OR, for defendants-appellees Oregon-Columbia Chapter of the National Electrical Contractors Association, Inc., Atlas Electrical Contractors, Inc. and Oregon Electric Construction, Inc.
 Gary L. Lieber, Paul M. Heylman and Henry A. Platt, Schmeltzer, Aptaker & Shepard, P.C., Washington, DC, for defendant-appellee National Electrical Contractors Association, Inc.
 James W. Kasameyer, Carney, Buckley, Kasameyer & Hays, Portland, OR, for defendant-appellee, Local 48, International Brotherhood of Electrical Workers.
 Arthur P. Rogers, Whiteford, Taylor & Preston, L.L.P., Washington, DC, amicus curiae for National Constructors Association.
 Appeal from the United States District Court for the District of Oregon, Helen J. Frye, District Judge, Presiding.
 Before: SCHROEDER, REINHARDT, and FERNANDEZ, Circuit Judges.
 SCHROEDER, Circuit Judge:
 
 
 1
 This is an antitrust action against the union and the subcontractors who are parties to the collective bargaining agreement covering electrical subcontracting in Oregon. Plaintiffs are non-signatory electrical subcontractors, including Phoenix Electric and a non-signatory contractor association, Associated Builders and Contractors. The defendants include Local 48 of the International Brotherhood of Electrical Workers ("union") and the signatory contractor association, the Oregon Chapter of the National Electrical Contractors Association ("ONECA").
 
 
 2
 Plaintiffs filed this action to challenge a job subsidy program that the union and ONECA established through collective bargaining. The program was adopted as a response to the dramatic decline in the number of commercialized electrical jobs awarded to unionized subcontractors, and the decline in union membership, during the early 1980s. By the time the program went into effect, the percentage of work being awarded to unionized subcontractors in the Oregon area had fallen from a high of 95% in the late 1970s to between 55% and 65%. The program targets specific jobs for subsidies in order to enable union subcontractors to bid more competitively against nonunion subcontractors, and is called Oregon Job Targeting Program ("OJTP"). The district court granted summary judgment for the defendants, Phoenix Electric Co. v. Nat'l Electrical Contractors Ass'n, Inc., 867 F.Supp. 925 (D.Or.1994), and plaintiffs appeal.
 
 
 3
 This is how OJTP works. The union has set up a subsidy fund financed by an assessment of 3 1/2 percent of the union workers' hourly wages. When a signatory subcontractor wants to use fund subsidies to lower its bid on a particular job, the subcontractor fills out a form in order to "target" the job. On the form the subcontractor estimates the number of labor hours the job will take and lists the known nonunion competition. The form goes to ONECA, which passes it on to the union. If the union decides to target the job, the union authorizes the subcontractor to base its bid on wages below the rates called for in the collective bargaining agreement. It also authorizes any other interested ONECA subcontractor to prepare a bid basing its calculations on the specially authorized lower wage.
 
 
 4
 If the first wage adjustment on a targeted job seems insufficient to win the work, the union will sometimes authorize a still lower wage. If an ONECA subcontractor is the winning bidder, it pays its union workers at the regular rate established in the collective bargaining agreement, but the union subsidizes those wages in an amount representing the difference between the regular wage and the specially authorized lower wage used to bid for the job.
 
 
 5
 The record shows that the union has authorized downward wage departures from the contract journeyman rate of between $19 and $20 per hour to as low as $11 an hour, although $13 per hour to $18 per hour appears to be more typical. The lower authorized wage never went below the minimum wage, and there is no indication that money was paid to any subcontractor in order to subsidize any costs other than wages.
 
 
 6
 Plaintiffs challenge OJTP as an unlawful restraint on competition in violation of Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(b) and 26, as well as of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2.[1] Plaintiffs' position is that OJTP is intended to drive out nonunion competition with union subcontractors in Oregon, and is therefore an unlawful restraint of trade. In the district court and in this appeal, plaintiffs point to evidence that the program was successful in forcing some nonunion subcontractors to sign the union agreement, and that the program was fueled by considerable animus toward nonunion subcontractors.
 
 
 7
 The district court granted summary judgment for the defendants. It concluded that the defendants were shielded by both the statutory exemption and the so called "nonstatutory exemption" from the antitrust laws. The latter exemption covers agreements between labor and employers that limit competition, so long as the agreements relate to wages, hours or other working conditions. See United Mine Workers of America v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); Connell Const. Co., Inc. v. Plumbers & Steamfitters Local Union No. 100, 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975). We hold that the district court correctly held that the defendants' conduct was protected under the nonstatutory exemption and therefore affirm.
 
 DISCUSSION
 
 8
 Labor benefits from two, distinct exemptions from antitrust liability: statutory and nonstatutory. The statutory exemption stems from the interlacing of the Sherman, Clayton, and Norris-LaGuardia Acts. See U.S. v. Hutcheson, 312 U.S. 219, 232, 61 S.Ct. 463, 466, 85 L.Ed. 788 (1941); USS-POSCO Industries v. Contra Costa County Bldg. & Const. Trades Council, AFL-CIO, 31 F.3d 800 (9th Cir.1994). Under the Clayton Act, for example, employee organizations are not considered illegal combinations in restraint of trade. 15 U.S.C. §§ 12 et seq. Under the Norris-LaGuardia Act, certain labor activities cannot be enjoined. 29 U.S.C. §§ 101 et seq. Examining the specific, express protections that Congress afforded labor, the Court recognized what is known as the statutory exemption for union activity. Hutcheson, 312 U.S. at 232, 61 S.Ct. at 466. The Court concluded that under this exemption, a union is exempt from the antitrust laws so long as it "acts in its own self interest and does not combine with nonlabor groups." Id.
 
 
 9
 Because unions cannot engage in collective bargaining activities without reaching, or attempting to reach, agreements with employers, the statutory exemption does not cover all of the activity that Congress' national labor policy encourages. Thus, the Supreme Court created a nonstatutory exemption for unions and employers who are parties to collective bargaining activities and agreements. See Local Union No. 189, Amalgamated Meat Cutters & Butcher Workmen of North America, AFL-CIO v. Jewel Tea Co., 381 U.S. 676, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965). Neither the statutory nor the nonstatutory exemption is absolute, and the scope of the exemption from antitrust liability for collective bargaining agreements has been the subject of spirited litigation that has profoundly affected relations between employers and unions in this country.
 
 
 10
 The two leading cases that discuss the nonstatutory exemption and provide the ground work for our decision in this case are Pennington and Connell.
 
 
 11
 In Pennington, the union and some of the larger and more efficient employers in the coal mining industry negotiated an agreement in which the union promised that it would impose the same wage scales on all other employers with whom it bargained, regardless of their ability to pay. Even though the agreement covered mandatory subjects of bargaining, the Court held the agreement constituted an unlawful restraint of trade because its effect was to impose wage scales on other employers, who were outside the scope of the bargaining unit. The Court held that the union forfeited its antitrust exemption when it agreed that it would impose the same wage scale on other employers:
 
 
 12
 We have said that a union may make wage agreements with a multi-employer bargaining unit and may in pursuance of its own union interests seek to obtain the same terms from other employers .... But we think a union forfeits its exemption from the antitrust laws when it is clearly shown that it has agreed with one set of employers to impose a certain wage scale on other bargaining units.
 
 
 13
 Pennington, 381 U.S. at 665, 85 S.Ct. at 1591. Pennington thus stands for the principle that parties to one collective bargaining relationship cannot attempt to control wages or working conditions of parties they do not represent.
 
 
 14
 Connell was a construction industry dispute in which the union had tried to force a general contractor, who did not employ workers whom the union represented, and who was not a party to the union's collective bargaining agreement with mechanical subcontractors, to agree to deal only with mechanical subcontractors who were parties to the union's collective bargaining agreement. The purpose was, of course, to exclude nonunion subcontractors from the general contractor's jobs. The Court held that such an agreement was not within either the statutory or nonstatutory exemption from antitrust liability. The Court acknowledged, as it had in Pennington and Jewel Tea, that federal labor policy supporting the collective bargaining process necessarily decreases competition over wages and other Congressionally mandated subjects of bargaining. At the same time, the Court recognized that competition based on efficiency is the driving policy behind the antitrust laws. The Court concluded that an agreement requiring the exclusion of nonunion subcontractors from the market, even if those subcontractors were more efficient in areas other than wages and working conditions, was not an agreement protected by any exemption from antitrust law. Connell, 421 U.S. at 625, 95 S.Ct. at 1836.
 
 
 15
 The agreements with Connell and other general contractors indiscriminately excluded nonunion subcontractors from a portion of the market, even if their competitive advantages were not derived from substandard wages and working conditions but rather from more efficient operating methods. Curtailment of competition based on efficiency is neither a goal of federal labor policy nor a necessary effect of the elimination of competition among workers. Moreover, competition based on efficiency is a positive value that the antitrust laws strive to protect.
 
 
 16
 Id. at 623, 95 S.Ct. at 1835.
 
 
 17
 The Eighth Circuit articulated a test to determine when the nonstatutory exemption is applicable. Mackey v. National Football League, 543 F.2d 606 (8th Cir.1976). The test derives from two principles: (1) the principle in Connell that agreements under the nonstatutory exemption may only be anticompetitive in areas such as wages and working conditions, and (2) the principle in Pennington, that agreements under the nonstatutory exemption should govern only the relationship between the agreeing parties. Under that test, the parties to an agreement restraining trade are exempt from antitrust liability only if (1) the restraint primarily affects the parties to the agreement and no one else, (2) the agreement concerns wages, hours, or conditions of employment that are mandatory subjects of collective bargaining, and (3) the agreement is produced from bona fide, arm's-length collective bargaining. Id. at 614.
 
 
 18
 This circuit adopted the Mackey test in Continental Maritime of San Francisco, Inc. v. Pacific Coast Metal Trades Dist. Council, Metal Trades Dept., AFL-CIO, 817 F.2d 1391 (9th Cir.1987), and thus it must guide our analysis of whether the nonstatutory exemption applies in this case. We hold that the district court correctly concluded that all three requisite conditions are satisfied, because OJTP is an arm's-length, collectively bargained agreement that affects only the wages of the parties to it.
 
 
 19
 Plaintiffs argue on appeal that the district court misapplied the first prong of the Mackey test, which asks whether the agreement primarily affects only the parties. In fact, the district court's analysis contains some language suggesting that it considered the issue to be whether OJTP was a restraint of trade, not whether "the restraint primarily affects only the parties to the collective bargaining relationship." Mackey, 543 F.2d at 614. The district court, in adopting the magistrate's findings, found that the "activities at issue do not restrain trade." The plaintiffs take issue with the district court's language, because it suggests that the district court confused the nonstatutory exemption with the substantive Sherman Act claim. See Herbert R. Northrop & Augustus T. White, Subsidizing Contractors to Gain Employment: Construction Union "Job Targeting", 17 Berkeley J. of Employment and Labor Law 1, 39 (1996)("What the [district court in Phoenix ] seems actually to have done is to conclude that the restraint is not unreasonable under the circumstances").
 
 
 20
 Plaintiffs are incorrect, however, to suggest that this particular agreement must be an unlawful restraint of trade simply because it is designed to target jobs where nonunion wage competition is stiff. Our decision in Continental Maritime v. Pacific Coast Metal Trades, 817 F.2d 1391 (9th Cir.1987) is particularly instructive, because it dealt with an agreement with aims similar to those of OJTP. Continental Maritime, like this case, involved an agreement between a union and employers to make the employers more competitive with nonunion contractors in the Pacific Northwest. The union there entered into special "project agreements" with two Portland shipyards so that they could pay lower wages than the wages specified in the master labor agreement that covered all West Coast shipyards. The plaintiff was a San Francisco shipyard that was signatory to the master agreement. The San Francisco shipyard sued the union and the two Portland shipyards that were party to the special project agreements, alleging that the agreements were the product of a conspiracy to grant wage concessions to some shipyards and not to others. We ruled that there was no factual showing that the agreement was intended to prevent the San Francisco shipyards from obtaining wage concessions. Rather, we credited defendant's view that the purpose of the agreement was to make the Portland shipyards more competitive with nonunion shipyards. Applying the Mackey test, we concluded that since the wage concessions were granted only to increase competitiveness against nonunion shipyards, the agreement affected only the parties, concerned a mandatory subject of collective bargaining, and was a product of bona fide arm's-length bargaining.
 
 
 21
 A similar result is compelled in this case. First, this agreement affects only the parties; it does not bar any union or nonunion subcontractors from competing with the signatory subcontractors for construction jobs. It, like the preference program in Continental Maritime, is intended to make the participating employers more competitive with nonunion subcontractors. The plaintiffs' position here is in fact even weaker than the plaintiff's position in Continental Maritime, for here there is nothing to suggest that OJTP was a conspiracy to give some union subcontractors better wage concessions than others. Further, unlike the agreement in Pennington, OJTP does not attempt to impose its terms on any nonsignatory party. Second, OJTP concerns a mandatory subject of collective bargaining because it relates to wages; there is no showing that the subsidy was used for anything other than wages or that the wages ever dropped below the legal minimum. Third, the agreement was the product of bona fide arm's-length bargaining. In support of that conclusion, defendants point to evidence that OJTP was offered as an alternative to an across-the-board union wage cut, and that OJTP was part of a negotiated package that included an increased hourly wage and a requirement that employers deduct union dues directly from employees' pay checks. Plaintiffs do not offer any evidence suggesting that OJTP was the product of anything other than legitimate negotiations.
 
 
 22
 Here, as in Continental Maritime, the parties to this agreement undoubtedly wanted the union subcontractors to increase their work at the expense of nonunion subcontractors. That of course is a legitimate goal of the union and its workers. Connell, 421 U.S. at 625, 95 S.Ct. at 1836. There is no indication, however, that this agreement is, or ever was intended to be, a bar to competition by nonunion subcontractors, as was the situation in Connell. A subsidy program that targets some jobs for more competitive wage components of signatory union subcontractor bids, and does not bar nonunion bidders from bidding on the same jobs, is in harmony with the policies of both the labor and antitrust laws.
 
 
 23
 Affirmed.
 
 
 
 [1]
 This court recently held that a two percent gross wage assessment on workers, used to fund a Nevada job targeting program, violated the Davis-Bacon Act. International Brotherhood of Electrical Workers, Local 357, AFL-CIO v. Brock, 68 F.3d 1194 (9th Cir.1995). Plaintiffs here, however, are employers, not employees, and do not pay a wage assessment. Therefore, plaintiffs in this case do not challenge OJTP as violating the Davis-Bacon Act, 40 U.S.C. §§ 276a et seq., and we are not called upon to consider whether OJTP is similar to the Nevada program in Brock